# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LEONARD SHAPIRO, Individually and on behalf of all others similarly situated, | |
| Plaintiff, | Case No. |
| v. | <u>CLASS ACTION</u> |
| BIOGEN INC., MICHEL VOUNATSOS, JEFFREY D. CAPELLO, MICHAEL R. MCDONNELL, ALFRED W. SANDROCK JR., and SAMANTHA BUDD HAEBERLEIN, | COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| | <u>JURY TRIAL DEMANDED</u> |
| Defendants. | |

Plaintiff Leonard Shapiro ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his undersigned counsel, hereby brings this Class Action Complaint for Violation of Federal Securities Law ("Complaint") against Biogen Inc. ("Company" or "Biogen"); Michel Vounatsos ("Vounatsos"), Biogen's current Chief Executive Officer ("CEO") and Director; Jeffrey D. Capello ("Capello"), Biogen's former Chief Financial Officer ("CFO") and Executive Vice President; Michael  R. McDonnell ("McDonnell"), Biogen's present CFO and Vice President; Alfred W. Sandrock Jr. ("Sandrock"), Biogen's Executive Vice President and Chief Medical Officer since 2015; and Samantha Budd Haeberlein ("Haeberlein"), Biogen's Vice President of Alzheimer's Disease Discovery & Development, based upon, *inter alia*, the investigation conducted by and under the supervision of Plaintiff's counsel, which included a review of the Company's public documents, conference calls, and announcements, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Company, analysts' reports and advisories about the Company and readily obtainable information.  Plaintiff's counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, the Company and Defendants Vounatsos, Capello, McDonnell, Sandrock, and Haeberlein. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a federal securities class action lawsuit on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired common shares of Biogen stock between October 22, 2019 and November 6, 2020, both dates inclusive (the "Class Period"), seeking to recover damages by Defendants' violation of the federal securities laws and to pursue

remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Biogen is a Delaware Company headquartered in Cambridge, Massachusetts. Biogen develops, discovers, and manufactures therapies for the treatment of neurological and neurodegenerative diseases, as well as autoimmune and hematologic disorders.   One of the Company's principal products in development is aducanumab, which is an investigational drug studied for the treatment of Alzheimer's disease – an irreversible and progressive degenerative disorder and the leading cause of dementia.

3.      In 2015, with the aim of establishing aducanumab as an effective treatment for Alzheimer's disease, Biogen launched two identical phase 3 trials, which compared the effects of 2 dosing regimens of aducanumab versus placebo.  At the time when approximately 50% of the participants completed 78 weeks of treatment, Biogen conducted a futility analysis to assess the ability of the ongoing clinical trials to achieve their objective.  Based on the results of Biogen's futility analysis, Biogen determined the trials were unlikely to meet their primary efficacy. Accordingly, in March 2019, Biogen announced the termination of its clinical trials.

4.      Despite the disappointing results of the futility analysis, Biogen was not ready to part with its vision of reaping enormous financial benefits stemming from the introduction of a breakthrough therapy for the treatment of Alzheimer's disease.  Accordingly, in October 2019 — approximately seven months after Biogen discontinued its phase 3 trials — Biogen shocked the medical community by announcing that its previously terminated trials were going to be revived based on newly analyzed data sets.  Following the resurrection of aducanumab's development program, Biogen embarked on months-long campaign to convince the investing public, as well as

the scientific community, including the FDA, that the post hoc data supported the conclusion that aducanumab was an effective solution in treating Alzheimer's disease.

5.    Since the October 2019 announcement, Biogen executives disseminated dozens of false and misleading statements in which they touted the post hoc data analyses purportedly arising from its phase 3 and phase 1 clinical trials and the implications thereof on aducanumab's regulatory approval.  For example, the Individual Defendants promoted the phase 3 clinical trials as providing consistent data for the support of aducanumab's efficacy while the phase 1 trials presented further support for aducanumab's regulatory approval.  To give credence to their courageous claims about aducanumab's prospects of obtaining regulatory approval, Biogen painted a picture of having the support of the FDA, who purportedly was exercising an intense oversight over Biogen's post hoc data analyses and research.  Based on Defendants' misleading claims regarding the strength and validity of its data analyses, the investing public reasonably expected that Biogen would secure regulatory approval of aducanumab during an upcoming review by the FDA Advisory Panel.

6.    In reality, however — and unbeknownst to the investing public — Biogen's post hoc analyses were an effort to explain away the discordant phase 3 trial results.  To achieve that objective, Biogen relied on dubious statistical gymnastics and scientifically and statistically unsound practices, which could not — and did not — withstand scrutiny by the scientific and medical community.  Contrary to Biogen's bold representations, the totality of the data did not provide sufficient evidence to support the efficacy of aducanumab for the treatment of Alzheimer's disease.

7.    The investing public learned the truth on November 6, 2020, when the FDA's independent Advisory Panel reviewed Biogen's submission.  After a seven-hour virtual meeting, the FDA Advisory Panel voted nearly unanimously that it was not "reasonable" to consider

Biogen's research as primary evidence of effectiveness of aducanumab.  In an overwhelmingly negative committee meeting, the Advisory Panel delivered harsh words of reality for Biogen, observing that its data was "strikingly incongruent" and lacked "compelling statistical review." After the Advisory Panel's vote, chances aducanumab's regulatory approval significantly diminished, leaving investors shocked and disappointed.

8.    On this news, the price of Biogen common shares dropped $92.64 per share, or 28%, to close at $236.26 per share, wiping more than $14 billion in investor wealth.

9.    Throughout the Class Period, Defendants made materially false and misleading statements, and failed to disclose material adverse facts about the Company's business, operational, and compliance policies. Specifically, Defendants made false and/or misleading statements and failed to disclose to investors that: (1) Study 302, viewed independently, did not provide strong evidence that supported the effectiveness of aducanumab; (2) Study 103 did not provide supportive evidence of the effectiveness of aducanumab; (3) Study 302 could not be considered as primary evidence of effectiveness of aducanumab for the treatment of Alzheimer's disease in light of the results of the exploratory analyses of Study 301 and 302 and the results of Study 103; (4) the totality of the data did not provide sufficient evidence to support efficacy of aducanumab for the treatment of Alzheimer's disease; and (5) as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

10.    As a result of the Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Biogen's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11.    The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and § 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

13.    Venue is proper in this judicial district pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as the alleged misstatements entered and the subsequent damages took place in this judicial district. Biogen is headquartered in this District, with its principal place of business located at 225 Binney Street, Cambridge, Massachusetts 02142.

14.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

15.    Plaintiff is a resident of Sarasota, Florida.  As set forth in the attached Certification, incorporated by reference herein, Plaintiff acquired Biogen shares during the Class Period, at artificially inflated prices, and was damaged by the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

16.    Biogen is a Delaware corporation with a principal place of business at 225 Binney Street, Cambridge, Massachusetts 02142.  Biogen's securities trade on the NASDAQ Exchange ("NASDAQ") under the ticker symbol "BIIB."

17.    Defendant Michel Vounatsos ("Vounatsos") has served as the Company's CEO and as a Director since January 2017.

18.    Defendant Jeffrey D. Capello ("Capello") served as the Company's CFO and Executive Vice President from December 2017 to August 2020.

19.    Defendant Michael R. McDonnell ("McDonnell") has served as the Company's CFO and Executive Vice President since August 2020.

20.    Defendant Alfred W. Sandrock, Jr. ("Sandrock") has served as the Company's Executive Vice President and Chief Medical Officer since November 2015.

21.    Defendant Samantha Budd Haeberlein ("Haeberlein") has served as the Company's Vice President of Alzheimer's Disease Discovery & Development since March 2020.  Haeberlein joined Biogen in 2015.

22.    Defendants Vounatsos, Capello, McDonnell, Sandrock, and Haeberlein are sometimes referred to herein as the "Individual Defendants." The Individual Defendants, together with Biogen, are sometimes referred to herein as the "Defendants."

23.    The Individual Defendants possessed the authority to control the contents of statements made by Biogen in the Company's reports to the SEC, press releases and presentations to securities analysis, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Due to their positions with Biogen, and access to Biogen's material information that was unavailable to the public, the Individual Defendants knew that the adverse facts described herein were not disclosed to and were being concealed from investors. The Individual Defendants are liable for the false statements and omissions alleged herein.

## SUBSTANTIVE ALLEGATIONS

### Background

24.    Biogen is a global biopharmaceutical company focused on discovery, development, manufacture, and delivery of therapies for treating neurological and neurodegenerative diseases, autoimmune, and hematologic disorders.  The Company's principal marketed products include treatments for multiple sclerosis, non-Hodgkin's lymphoma, arthritis, Crohn's disease, psoriasis, and Alzheimer's disease.

25.    Alzheimer's disease is an irreversible, progressive neurodegenerative disorder that slowly destroys memory and thinking skills. Initial impairment in memory may be followed by behavioral and neuropsychiatric symptoms, and finally a person's ability to perform usual daily life activities. Alzheimer's disease is the most common cause of dementia among older adults and is ultimately fatal.

26.    One of Biogen's most promising drugs in development is aducanumab (BIIB037), an investigational human monoclonal antibody (mAb) targeting amyloid-β multimers studied for the treatment of early Alzheimer's disease.  The use of aducanumab is predicated on the still-unproven "amyloid hypothesis," which dates back to the early 1990s and posits that deposition of amyloid plaques in the brain causes the neuronal degeneration seen in Alzheimer's disease. Deposition β-amyloid peptides into amyloid plaques begins decades prior to observable clinical symptoms, and is therefore, a fundamental pathological hallmark of the Alzheimer's disease.

27.    In 2015, after promising early clinical data from the early phase Study 103, Biogen launched two identical phase 3 trials (Study 301 and Study 302).  Studies 301 (ENGAGE) and 302 (EMERGE) were multicenter, randomized, double-blind, placebo-controlled clinical trials to evaluate the safety and efficacy of aducanumab in reducing clinical decline, as measured on the Clinical Dementia Rating Scale – Sum of Boxes ("CDR-SB"), which is an established measure of

cognition and function in early symptomatic Alzheimer's disease.  The phase 3 studies compared the effects of 2 dosing regimes of aducanumab versus placebo over the 18-month placebo-controlled period.  Participants were randomized 1:1:1 to aducanumab low dose, aducanumab high dose, or placebo.

28.    The phase 3 protocols and statistical analysis plans specified that an interim prespecified analysis for futility would be conducted after approximately 50% of the participants in the studies completed 78 weeks of treatment.  The data cutoff for the futility analysis was December 26, 2018.  The futility analysis — which was intended to assess the clinical trials' ability to achieve the objective — showed that patients in the high-dose group (Study 302-EMERGE) exhibited -18% improvement in the conditional power for CDR-SB as compared to placebo, while patients in the low-dose group (Study 301 -ENGAGE) exhibited 15% worse results than the placebo group.   Based on these results, Biogen concluded that the trials were unlikely to meet their primary efficacy endpoint upon completion.  Accordingly, on March 21, 2019, Biogen and its partner Eisai, Co., Ltd. ("Eisai") announced their decision to terminate both  pivotal phase 3 trials.

29.    Meanwhile, in an effort to understand why the studies had divergent outcomes based on the December 26, 2018 cutoff, Biogen re-ran the primary analysis using all data collected up to March 20, 2019 when the announcement to terminate the phase 3 trials was made.  The new results differed from the December 2018 results, showing improved treatment effect of -22% in favor of aducanumab in Study 302 and 2% treatment effect favoring placebo in Study 301. Following these results, Biogen determined that further analyses of the phase 3 data was needed in determining the future of the aducanumab development program.

*30.*    On June 14, 2019 and October 21, 2019, Biogen met with the FDA in a Type C meeting.  During the meetings, the FDA concluded that the results of Studies 301 and 302 "might provide evidence adequate to establish the effectiveness of aducanumab for the treatment of Alzheimer's disease."  Importantly, however, the FDA expressed skepticism that Study 301 could be used as an independent evidence of effectiveness:

> ***Available data do not suggest the future use of Study 301 as an efficacy study providing independent evidence of effectiveness supporting the approval of aducanumab for the treatment of Alzheimer's disease.***

31.    The October 21, 2020 Type C meeting also left unanswered questions regarding the relationship between aducanumab dose-exposure and response in Studies 301 and 302.  The FDA's position was that the combination of the positive Study 302,  dose-response relationship observed in Study 103, and the numerically favorable results of similar magnitude in the low-dose groups in both studies, the high-dose group in Study 301 stood apart for the negative outcome.  Thus, the October 21, 2020 Type C meeting with the FDA left many areas of inquiries uncertain.

32.    Notwithstanding these and other uncertainties expressed by the FDA during Biogen's frequent interaction therewith, Biogen embarked on a public campaign to tout FDA's purported unflinching support for the regulatory approval of aducanumab and their own overly enthusiastic conclusions about the implications of the clinical trials, which Biogen and the Individual Defendants presented as strongly supporting the efficacy of aducanumab for the treatment of Alzheimer's disease.

## Materially False and Misleading Statements

33.    On October 22, 2019 — in light of the new statistical analyses of all data collected until March 20, 2019 — Biogen issued a shocking press release entitled "Biogen Plans Regulatory Filing for Aducanumab in Alzheimer's Disease Based on New Analysis of Larger Dataset from Phase 3 Studies," in which Biogen announced that it was pursuing regulatory approval based on a

new and more positive analysis from two large clinical trials previously thought to be negative.  In the press release, Biogen explained that they re-analyzed data from the trials to include patients who had continued in the studies from the December 26, 2018 cut-off date for the futility analyses to March 21, 2019, when futility was announced.  The press release stated in relevant part:

> CAMBRIDGE, Mass. and TOKYO, Oct. 22, 2019 (GLOBE NEWSWIRE) -- Biogen (Nasdaq: BIIB) and Eisai, Co., Ltd. (Tokyo, Japan) today announced that, after consulting with the U.S. Food and Drug Administration (FDA), ***Biogen plans to pursue regulatory approval for aducanumab, an investigational treatment for early Alzheimer's disease (AD). The Phase 3 EMERGE Study met its primary endpoint showing a significant reduction in clinical decline, and Biogen believes that results from a subset of patients in the Phase 3 ENGAGE Study who received sufficient exposure to high dose aducanumab support the findings from EMERGE.*** Patients who received aducanumab experienced significant benefits on measures of cognition and function such as memory, orientation, and language. Patients also experienced benefits on activities of daily living including conducting personal finances, performing household chores such as cleaning, shopping, and doing laundry, and independently traveling out of the home. ***If approved, aducanumab would become the first therapy to reduce the clinical decline of Alzheimer's disease and would also be the first therapy to demonstrate that removing amyloid beta resulted in better clinical outcomes.***
>
> ***The decision to file is based on a new analysis, conducted by Biogen in consultation with the FDA, of a larger dataset from the Phase 3 clinical studies that were discontinued in March 2019 following a futility analysis.*** This new analysis of a larger dataset that includes additional data that became available after the pre-specified futility analysis shows that aducanumab is pharmacologically and clinically active as determined by dose-dependent effects in reducing brain amyloid and in reducing clinical decline as assessed by the pre-specified primary endpoint Clinical Dementia Rating-Sum of Boxes (CDR-SB). In both studies, the safety and tolerability profile of aducanumab was consistent with prior studies of aducanumab.
>
> "With such a devastating disease that affects tens of millions worldwide, today's announcement is truly heartening in the fight against Alzheimer's. ***This is the result of groundbreaking research and is a testament to Biogen's steadfast determination to follow the science and do the right thing for patients,"*** said Michel Vounatsos, Chief Executive Officer at Biogen. "We are hopeful about the prospect of offering patients the first therapy to reduce the clinical decline of Alzheimer's disease and the potential implication of these results for similar approaches targeting amyloid beta."
>
> ***Based on discussions with the FDA, the Company plans to file a Biologics License Application (BLA) in early 2020*** and will continue dialogue with

regulatory authorities in international markets including Europe and Japan. **The BLA submission will include data from the Phase 1/1b studies as well as the complete set of data from the Phase 3 studies.**

*    *    *

Following the discontinuation of EMERGE and ENGAGE, additional data from these studies became available resulting in a larger dataset, which included a total of 3,285 patients, 2,066 of whom had the opportunity to complete the full 18 months of treatment. **A new extensive analysis of this larger dataset showed a different outcome than the outcome predicted by the futility analysis. Specifically, the new analysis of this larger dataset showed EMERGE to be statistically significant on the pre-specified primary endpoint (P=0.01).** Biogen believes that data from a subset of ENGAGE support the findings from EMERGE, though ENGAGE did not meet its primary endpoint. Biogen consulted with external advisors and the FDA on these different results and their implications.

**"This large dataset represents the first time a Phase 3 study has demonstrated that clearance of aggregated amyloid beta can reduce the clinical decline of Alzheimer's disease, providing new hope for the medical community, the patients, and their families,"** said Dr. Anton Porsteinsson, William B. and Sheila Konar Professor of Psychiatry, Neurology and Neuroscience, director of the University of Rochester Alzheimer's Disease Care, Research and Education Program (AD-CARE), and principal investigator. "There is tremendous unmet medical need, and the Alzheimer's disease community has been waiting for this moment. I commend Biogen, the FDA, the medical community, and the patients and their study partners for their persistence in working to make today's announcement a reality."

**In EMERGE, which met its pre-specified primary endpoint in the new analysis, patients treated with high dose aducanumab showed a significant reduction of clinical decline from baseline in CDR-SB scores at 78 weeks (23% versus placebo, P=0.01).** In EMERGE, patients treated with high dose aducanumab also showed a consistent reduction of clinical decline as measured by the pre-specified secondary endpoints: the Mini-Mental State Examination (MMSE; 15% versus placebo, P=0.06), the AD Assessment Scale-Cognitive Subscale 13 Items (ADAS-Cog 13; 27% versus placebo, P=0.01), and the AD Cooperative Study-Activities of Daily Living Inventory Mild Cognitive Impairment Version (ADCS-ADL-MCI; 40% versus placebo, P=0.001). Imaging of amyloid plaque deposition in EMERGE demonstrated that amyloid plaque burden was reduced with low and high dose aducanumab compared to placebo at 26 and 78 weeks (P<0.001). Additional biomarker data of tau levels in the cerebrospinal fluid supported these clinical findings. **Biogen believes that data from patients in ENGAGE who achieved sufficient exposure to high dose aducanumab supported the findings of EMERGE.**

In both studies, the most commonly reported adverse events were amyloid-related imaging abnormalities-edema (ARIA-E) and headache. The majority of patients

with ARIA-E did not experience symptoms during the ARIA-E episode, and ARIA-E episodes generally resolved within 4 to 16 weeks, typically without long-term clinical sequelae. Biogen plans to present further detail on the new analysis of the larger dataset from EMERGE and ENGAGE at the Clinical Trials on Alzheimer's Disease (CTAD) meeting in December 2019.

***After reviewing the data in consultation with the FDA, Biogen believes that the difference between the results of the new analysis of the larger dataset and the outcome predicted by the futility analysis was largely due to patients' greater exposure to high dose aducanumab. Multiple factors contributed to the greater exposure to aducanumab in the new analysis of the larger dataset, including data on a greater number of patients, a longer average duration of exposure to high dose, the timing of protocol amendments that allowed a greater proportion of patients to receive high dose, and the timing and pre-specified criteria of the futility analysis.***

\*    \*    \*

34.    On the same day, October 22, 2019, Biogen released a Company Presentation slideshow entitled "Aducanumab Update," which, among other things, touted the results of the additional data from EMERGE and ENGAGE trials:



**Aducanumab summary**

1   Following discussions with the FDA, Biogen plans to submit a regulatory filing in early 2020

2   The futility analysis in March 2019 was based on a smaller, earlier dataset with less exposure to high dose aducanumab. The result of the futility analysis was incorrect.

3   New analysis of larger dataset showed that aducanumab reduced clinical decline in patients with early Alzheimer's disease as measured by the pre-specified primary and secondary endpoints

4   The positive results of this new analysis were driven primarily by greater exposure to high dose aducanumab in the larger dataset

5   If approved, aducanumab would become the first therapy to reduce clinical decline in Alzheimer's disease

Biogen

## Phase 3 aducanumab data



**Sufficient exposure to high dose aducanumab reduced clinical decline across multiple clinical endpoints**

- This reduction in clinical decline was **statistically significant in EMERGE**

- Biogen believes data from patients who achieved **sufficient exposure to high dose aducanumab in ENGAGE support the findings of EMERGE**

- After consultation with the FDA, we believe that the **totality of these data support a regulatory filing**

- Patients included in the **futility analysis** had enrolled early in the studies and **had lower average exposure to aducanumab**

- **Two protocol amendments** were put in place to enable **more patients to reach high dose** and for a longer duration

- Differences between EMERGE and ENGAGE can mostly be accounted for by **greater exposure to high dose in EMERGE**





35.    On October 22, 2019, Biogen filed its quarterly report on SEC Form 10-Q for the

period ended September 30, 2019 (the "3Q19 Report") which was signed by Defendant Capello.

Annexed to the 3Q19 Report were certifications pursuant to the Sarbanes-Oxley Act of 2002

("SOX") signed by Defendants Vounatsos and Capello, attesting to the accuracy of financial

reporting, the disclosure of any material changes to the Company's internal control over financial

reporting and the disclosure of all fraud.

36.    The 3Q19 Report stated the following, regarding Biogen's plans of obtaining

regulatory approval of aducanumab:

> On October 22, 2019, we and Eisai Co., Ltd. (Eisai) announced that we plan to
> pursue regulatory approval for aducanumab in the U.S. and that the Phase 3
> EMERGE study met its primary endpoint showing a significant reduction in
> clinical decline. We believe that results from a subset of patients in the Phase 3
> ENGAGE study who received sufficient exposure to high dose aducanumab
> support the findings from EMERGE. ***The decision to file is based on a new
> analysis, conducted by Biogen in close consultation with the FDA, of a larger
> dataset from the Phase 3 EMERGE and ENGAGE trials that were discontinued
> in March 2019 following a futility analysis.***

37.    During the Earnings Call held on October 22, 2020 to discuss the Company's

financial and operational results, several Defendants touted the results of Biogen's clinical trials

and provided overly optimistic projections as to Biogen's ability to develop and commercialize

aducanumab.  For example, Defendant Vounatsos provided the following update regarding

Biogen's renewed efforts at aducanumab's regulatory approval:

> ***This is an important day as we are announcing that based on discussion with the
> FDA, we plan to submit a regulatory filing in the US for aducanumab. If
> approved, aducanumab will become the first therapy to reduce clinical decline in
> Alzheimer's disease and the first therapy to show that removing amyloid beta can
> lead to better clinical outcomes.*** This is an important milestone, providing hope for
> patients, physicians, caregivers and families around the world.
>
> It is also important to highlight that the path taken in the pursuit of discovering and
> developing breakthrough treatments is not always direct and straightforward. As
> you know, in March, we announced our decision to discontinue the Phase 3
> EMERGE and ENGAGE studies for aducanumab in Alzheimer's disease, based on
> a pre-specified futility analysis. ***In retrospect, the results of our futility analysis
> was incorrect. Based on what we know now, it is clear that the pre-specified
> futility criteria did not adequately anticipate the effect of all the variables in these
> trials.***
>
> So, what happened? First, the decision to stop these trials relied on an earlier and
> smaller dataset comprised only of patients who had the opportunity to complete 18
> months of treatment as of December 26, 2018. At that time, the futility analysis

16

predicted that the trials were unlikely to meet the primary endpoint upon completion. Futility analysis are common in large studies, and they use statistical modeling to attempt to predict the outcome of the studies based on a number of pre-specified assumptions and criteria. There are multiple methodologies that can be used for futility analysis and the methodology we used was a well-accepted approach. ***However, based on what we have learned, we know now that the futility analysis did not adequately account for the effect that the earlier enrollment in ENGAGE had on patients' overall exposure to high dose aducanumab.***

Second, in the months following the discontinuation of the studies, our team has continued to analyze the vast set of clinical imaging and biomarker data that the studies have generated. In addition to further analysis of the dataset which informed the futility analysis, we also gained access to an analyzed additional data, including data on patients who completed treatment after the cut-off date for the futility analysis as well as data for patients who did not complete the full duration of the study. ***Once we became aware of the potential implication of this larger dataset, we consulted with external advisors, followed by the FDA with a Type C Meeting in June, as we began conducting further analysis.***

38.     According to Defendant Vounatsos, these "positive clinical results for aducanumab position[ed] Biogen to potentially[ lead the fight against Alzheimer's disease" and to "submit[ ] the regulatory filing for aducanumab in the US while continuing the dialog with regulatory authorities in international markets, including in Europe and in Japan." Importantly, Defendant Vounatsos concluded by reiterating Biogen is "excited to be moving ahead and preparing for regulatory filing for aducanumab on the ground of positive clinical results . . . [which] is a major step in the fight against Alzheimer's disease and in important inflection point for Biogen's neuroscience mission."

39.     Defendant Sandrock echoed Defendant Vounatsos' overly enthusiastic statements, reiterating the "positive results of aducanumab," which according to Defendant Sandrock, positioned Biogen to "deliver breakthrough therapies for Alzheimer's disease." Defendant Sandrock commented on the relevant clinical trials as follows:

I'm extremely proud of the team for all the hard work that brought us to today's announcement on aducanumab, and ***I believe now more than ever that Biogen is uniquely positioned to bring breakthroughs in neuroscience and transform the lives of patients with neurological disease.***

[W]e were all surprised when we learned of the potential implications of the new analysis of a larger dataset from the Phase 3 studies of aducanumab. *Following discussions with external advisors and the FDA, we have now come to better understand what happened*, *and even more importantly with the positive implications of the larger dataset* may mean for patients, physicians and the broader scientific community.

*     *     *

Our primary learning from these data is that *sufficient exposure to high dose aducanumab reduced clinical decline across multiple clinical endpoints. This reduction in clinical decline was statistically significant in EMERGE, and we believe that patients -- that the data from patients who achieved sufficient exposure to high dose aducanumab in ENGAGE support the findings of EMERGE. After consultation with the FDA, we believe that the totality of these data support a regulatory filing.* Importantly, patients included in the futility analysis were those who had enrolled early in the trials and those early enrolling patients had a lower average exposure to aducanumab in large part due to two protocol amendments that occurred sometime after the start of the trials. These two protocol amendments were put in place precisely to enable more patients to reach high dose aducanumab, and for a longer duration. As a consequence, the larger dataset available after trial cessation included more patients with sufficient exposure to high dose aducanumab.

*Moreover, differences between EMERGE and ENGAGE can mostly be accounted for by a greater level of exposure to high dose aducanumab in EMERGE due to multiple factors including the fact that ENGAGE started earlier and enrolled earlier than EMERGE, meaning that fewer patients in ENGAGE had sufficient exposure to high dose aducanumab, as well as other factors including differences in the degree of dose suspension due to ARIA. Taken together, we believe that these data and the associated extensive analysis provide compelling evidence that aducanumab reduces the otherwise devastating and inexorable clinical decline of Alzheimer's disease.*

40.     Defendant Haeberlein provided a detailed description of the clinical trials,

summarizing the following results:

So, to summarize, first, across multiple clinical endpoints, *the larger aducanumab dataset demonstrated a statistically significant reduction of clinical decline in early Alzheimer's disease patients in EMERGE, and we believe that data from a subset of ENGAGE support these findings. Second, exposure to high dose aducanumab was important for efficacy and differences and exposure to high dose aducanumab largely explain the different result of futility analysis and the new analysis of this larger dataset as well as the different results between the two studies. Finally, following consultation with the FDA, we believe it is reasonable to submit a regulatory filing for aducanumab based on these data.*

\*        \*        \*

Third, the new analysis of the larger dataset which was conducted in consultation with the FDA, showed that aducanumab had a dose-dependent effect on the underlying pathology as measured by amyloid-PET imaging and reduced clinical decline in patients with early Alzheimer's disease as measured by the pre-specified primary and secondary endpoints. Based on the second Type C meeting held with the FDA, just yesterday, we believe this data support a regulatory filing.

41.    Several analysts questioned the accuracy of Biogen's interpretation of the data, reflecting deep skepticism about the post hoc analyses conducted by Biogen.  For example, Evercore analysts pointed to the fact that **"CDR Sum of the Boxes low dose actually looks more consistent with the high dose and also for patients that did not make it to the large opportunity to complete dataset, _those patients actually especially in MMSE more consistent than the patients that did have a sufficient exposure._"**  Similarly, Merrill Lynch analyst questioned why "half of merger [(*sic*), meaning EMERGE] achieved significance at the high dose and none of ENGAGE achieved it."  In response to these inquiries, Defendant Sandrock provided the following explanation:

In terms of the EMERGE and ENGAGE, I -- we looked at -- we look at ENGAGE in totality as a positive study that stands on its own. And remember, as Samantha said we use prespecified primary and secondary outcomes, we didn't look at a subset. **_We looked at all the patients and based on that, we believe the study met its primary endpoint and the secondary endpoints as well._**

**_I think that whether or not a single trial can be approved, there are circumstances where an FDA can approve a drug based on a single study, it's up to them to determine what those circumstances are, and so I'll just leave it at that and then I would say that ENGAGE, we believe, we showed the data for example in those who achieve sufficient exposure to 10 milligrams per kilogram. We do see evidence of efficacy. So I would say that EMERGE stands on its own, ENGAGE has supportive evidence, and I would also say that PRIME is supportive, it's a well controlled Phase 1b, some may call it Phase 2 trial, and we'll submit all the data._**

42.    Biogen's surprise news of renewed regulatory approval process for aducanumab presented a massive positive for Biogen.  As a result, the price of Biogen common stock shot up

from $222.00 open on October 21, 2019 to a high of $318 during intraday trading on October 22, 2020, a spike of 43%.

43.    Despite Biogen's efforts to hype the market about the potential regulatory approval of aducanumab, some analysts remained skeptical about Biogen's interpretation of its own data. For example, on October 30, 2019, Bloomberg Senior Industry Analyst, Sam Fazell published a report titled "Aducanumab Comeback and What it Means for Alzheimer's," in which he concluded that the "surprise resurrection of aducanumab may be too good to be true."  In his report, the analysts pointed out that the two studies, EMERGE and ENGAGE "had identical designs and similar baseline characteristics, yet Emerge showed statistically significant reduction in patients' cognitive decline, while Engage didn't."  As to Biogen's explanation that the results were driven by exposure to higher dose of aducanumab, Fazell noted that the "longitudinal change from baseline in Amyloid PET at week 78 looks very similar between the two trials, despite the difference in outcome and conclusion." Furthermore, Fazell observed the lack of detail Biogen disclosed in its high-dose subgroup analysis, including Biogen's failure to provide baseline characteristics of the patients, which could have contributed to the difference, as well as lack of statistical analysis or even "error bars" on the data provided.  Finally, Fazell concluded that the "Amyloid reductions appear to be very similar to that for the whole population, so why are the results different if the antibody is working through Amyloid?"

44.    On November 21, 2019, during a STAT Summit, Biogen's top scientist, Defendant Sandrock offered unflinching support for the efficacy of aducanumab, shrugging off outside skepticism, stating: "I believe the drug works" and "I'm very excited about the prospect of getting the drug approved."  Defendant Sandrock continued: ***"I don't think the field has ever seen data like this."***  During the meeting, Defendant Sandrock commented on FDA's potential approval of

aducanumab, reporting that the FDA told Biogen that it was "reasonable" to file for aducanumab's approval.  Defendant Sandrock concluded that if the FDA rejected the drug or asked for additional clinical trials, "lots more people" would get Alzheimer's without a treatment.  Despite that Biogen planned on — and did meet with the FDA on at least three other occasions to review and discuss the data — Defendant Sandrock declared that the decision to approve aducanumab was in "in their hands now."

45.     On December 5, 2019, Biogen presented new data at the Clinical Trials on Alzheimer's Disease ("CTAD") Congress 2019.   The Company's presentation slideshow contained post-hoc analysis of Emerge and Engage of patients who received the highest dose of aducanumab after its introduction into the trial (protocol version 4 ("PV4")), including the following slides which summarized the new results:



46.     The post-hoc analysis did not show improvement in primary efficacy endpoint in Study 301 aducanumab at both high and low dosing regiments, whereas Study 302 resulted in

statistically significant but small improvements in the primary efficacy endpoint in the high dosing

regimen only.

47.    During a Q&A Call held on December 5, 2019 to discuss the new aducanumab

Phase 3 topline results, Defendants Haeberlein and Sandrock continued to tout the new results.

For example, Defendant Haeberlein commented on the new data, stating:

> [T]oday, though we shared a new post-hoc analysis, which is what we've called
> those that sub-group of individuals who were able to have the opportunity for the
> intended dosing regimen, the co-called Protocol Version 4 Group and in that subset
> of patients Aducanumab did support the positive findings of EMERGE and
> ENGAGE.

48.    Defendant Sandrock further highlighted the different results:

> [The] reduction [in the low dose group] was similar between EMERGE and
> ENGAGE, but in the high-dose group there was actually a difference. . . Even
> though that the amyloid PET was done in a sub-study [,] [i]t is such precise
> measurement.  If you look at the error bars, they're tiny, they almost blend right
> into the actual symbol.  And so the class differences between – the difference
> between EMERGE and ENGAGE actually is significant and . . .in the EMERGE
> trial reduction was, what we have expected based on the prime data but in
> ENGAGE, it fell short.

49.    When asked about future regulatory approval, Defendant Sandrock commented:

> ***[W]e don't file willy-nilly, I mean we only go to filing when we believe that there
> is a benefit risk argument based on science, based on data*** and look -- I mean if
> you look at our history, we haven't done filings right and left without good reason
> and so -- and look, it's a lot of work to do filing and it's also a lot of work for FDA
> or other regulators that have to review the filings. So, these are not things that we
> just do lightly. . .

50.    The new results and the Company presentation failed to dispel analysts' questions

regarding the efficacy and safety of aducanumab.  As some analysts pointed out, "the apparent

positive effect in Engage post PV4 appear[ed] to be driven as much by a worse-performing placebo

group, which is difficult to explain given nothing changed in that group, as by better performance

in the high-dose group."  Others similarly pointed out that the "placebo in EMERGE (the positive

study) performed worse than what would have been expected, while the ENGAGE (the negative

study) placebo performed more in line."

51.    Despite the lack of any new evidence, which could dispel doubts about

aducanumab's future regulatory approval, Defendants continued to tout Biogen's prospect of

securing FDA's approval.  For example, during the JP Morgan Healthcare Conference held on

January 14, 2020, Defendant Sandrock commented on Biogen's collaboration with the FDA,

stating:

> *We've been constructively engaged with FDA basically since last June when we had our first Type C meeting and we continue to be engaged with them, and it's a matter of summit -- preparing all the different modules of the common technical document and submitting them to FDA as rapidly as possible*.
>
> \*      \*      \*
>
> *Well, I think we have a good chance of looking back and saying that it was approved, although we don't know until the final decision is made.* I think -- *and if we were to look at why, I would say in addition to the EMERGE, ENGAGE and PRIME dataset that I just talked about, I think FDA has to weigh the fact that this is a very serious disease, it's fatal and it's terribly disabling. There are no alternative treatments.* They'll look at the safety associated with the drug, they'll look to see whether or not there is a mechanistic -- that we understand the mechanism of action of the drug and does it make sense in the context of the pathophysiology of the disease, they will look at effects for example like on the tile [ph] biomarkers we showed at CTAD, which I think will also help and they'll see whether other drugs like it, for example, BAN2401, the close, the most similar antibody to Aducanumab, does that provide any supportive evidence as well. *So, I think they will look at the totality of the -- of all that and make a very, it's going to be a difficult decision for them, right. I mean it always is it seems. But I think they'll make the right decision for patients.*
>
> \*      \*      \*
>
>  . . . *I would reemphasize the fact that we have had very active and constructive engagement with FDA, all along since June. So functionally we have all the engagement we would ever want.*

52.    In response to a JP Morgan analyst's question, regarding what groundwork Biogen

was Biogen laying to prepare for potential launch of aducanumab, Defendant Vounatsos disclosed

that Biogen already started building a medical affairs team in order to engage with scientific

committees, assemble pilot teams, and hiring and promoting top talent.  Defendant Sandrock added

that the Company even began a state-of-the-art manufacturing facility in Switzerland, which will

manufacture aducanumab along with Biogen's existing facility in North Carolina.

53.    On January 30, 2020, Biogen issued a press release announcing its results of

operations and financial condition for the fourth quarter and year ended December 31, 2019.  The

Press Release titled "BIOGEN REPORTS FULL YEAR 2019 REVENUES OF $14.4 BILLION"

quoted Defendant Vounatsos touting aducanumab and its prospects with the FDA: "In addition, as

part of our expanded pipeline, *we are excited about the prospects for aducanumab in Alzheimer's*

*disease and look forward to completing a regulatory filing in the U.S. as soon as possible*."

54.    On the same day, January 30, 2020, the Company held a Q4 2019 Earnings Call to

discuss Biogen's financial and operational results.   During the call, Defendant Vounatsos

confirmed Biogen's engagement with the FDA, stating that *"[Biogen] was actively engaging with*

*the FDA as well as regulators in Europe and Japan and [ ] look[s] forward to completing*

*regulatory filing in the US as soon as possible."*

55.    Defendant Sandrock provided additional assurances regarding Biogen's anticipated

submission to the FDA and its collaboration with the regulator:

> . . . It's basically a matter of putting together documentation, the electronic common technical document, it's an electronic document with hyperlinks et cetera. It's a matter of assembling all that and submitting that to the FDA.
>
> *And in terms of the engagement, we've been engaged with them since last -- the first Type C meeting last June and it's been very constructive.* This is a unique situation to me. It's pretty unusual I think across the industry, but I will say that *it's been -- there's been a high level of constructive engagement ever since last June.*

56.    On February 6, 2020, Biogen filed its annual report on SEC Form 10-K for the

period ended December 31, 2019 (the "2019 Annual Report") which was signed by Defendant

Vounatsos. Attached to the 2019 Annual Report were certifications pursuant to SOX signed by

24

Defendants Vounatsos and Capello attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

57.    The 2019 Annual Report listed aducanumab as one of Biogen's "Core Growth Areas" and stated regarding FDA approval:

> In October 2019 we and our collaboration partner Eisai announced that we plan to pursue regulatory approval for aducanumab in the U.S. and that the Phase 3 EMERGE study met its primary endpoint showing a significant reduction in clinical decline. ***We believe that results from a subset of patients in the Phase 3 ENGAGE study who received sufficient exposure to high dose aducanumab support findings from EMERGE. The decision to file is based on a new analysis, conducted in consultation with the FDA, of a larger dataset from the Phase 3 EMERGE and ENGAGE trials that were discontinued in March 2019 following a futility analysis.***
>
> *        *        *
>
> ***In 2020 we expect selling, general and administrative costs, including increases in headcount and other commercial infrastructure, to significantly increase as we support pre-launch activities associated with the potential regulatory approval of aducanumab.***
>
> *        *        *
>
> In March 2019, based on a pre-specified futility analysis, we discontinued the global Phase 3 trials, EMERGE and ENGAGE, designed to evaluate the efficacy and safety of aducanumab in patients with early AD. ***A new analysis of a larger dataset from these trials, conducted in consultation with the FDA, showed that the Phase 3 EMERGE study met its pre-specified primary and secondary endpoints.*** In October 2019 we and Eisai announced that we plan to pursue regulatory approval for aducanumab in the U.S.

58.    On March 2, 2020, Biogen held a conference call in connection with the Cowen Annual Health Care Conference.  During the conference call, Defendant Vounatsos continued to tout Biogen's "sustained and constructive engagement with the US regulator."  Furthermore, Defendant Vounatsos reported that Biogen was "***making very good progress on a filing*** as soon

as possible . . ." When asked about the key risks to the FDA approval process, Defendant

Vounatsos dodged the question, discussing Biogen's market model, instead:

> So we are, building up the go-to market model, and -- in the US and we do not
> speculate on what would be the FDA's decision, we respect that again for the third
> time, we step back and we are optimistic since we are building the go-to-market in
> the US that should be the first product that we have -- the first country, we have the
> product approved. And the progress is good, we are building the medical affairs
> team, the commercial team we are making tremendous progress on access
> conditions, we are engaging and trying to force the partnering opportunity, because
> it's not one company with one product that will solve a complex situation.
>
> So we try to engage on -- with key partners on questions affordability, population
> health and the specificity of the Medicare Plan B, and I mean this is what we are
> doing so far, so, so far so good.

59.     On April 22, 2020, Biogen issued a press release on SEC Form 8-K, entitled

"BIOGEN REPORTS Q1 2020 REVENUES OF $3.5 BILLION."  Defendant Vounatsos was

quoted in the press release, stating "we continued to develop and expand our pipeline, ***including***

***making good progress toward the U.S. regulatory filing for aducanumab…"***  As to aducanumab

regulatory approval, the press release stated that "Biogen is continuing its frequent interactions

with regulatory authorities including for aducanumab" and provided the following updates:

- Biogen has an open Biological License Application (BLA) with the U.S.
  Food and Drug Administration (FDA) and has started to submit modules
  of the filing.

- Biogen has participated in additional formal interactions with the FDA
  using mechanisms such as Type C meetings and is preparing for a pre-
  BLA meeting, currently scheduled for the summer of 2020.

- Following the pre-BLA meeting, Biogen expects to complete the U.S.
  filing in the third quarter of 2020.

60.     On the same day, April 22, 2020, the Company held an earnings call to discuss

Biogen's financial and operational results for the first quarter 2020.  During the earnings call,

Defendant Vounatsos reaffirmed that Biogen was "***on track and we are receiving input from the***

**FDA and we are engaging very well."** Defendant Sandrock reiterated that Biogen was "continu[ing] constructive engagement with FDA and [was] on track in terms of the potential for approval." When asked about Biogen's level of confidence in the data set submitted to the FDA, Defendant Sandrock stated that "nothing really has changed in terms of nothing has come up in the data that changes our interpretation of the data." Defendant Sandrock emphasized that Biogen "remain[s] constructively engaged [with the FDA through Type C meetings] as [it] ha[s] been since the very beginning actually starting last June . . . ."

61.    During the same earnings call, Evercore analyst inquired whether the FDA shared any feedback with Biogen or requested additional analyses giving rise to additional meetings between Biogen and the FDA. In response, Defendant Vounatsos confirmed that Biogen **"had additional Type C meetings and you have to read here high interest from the FDA.** So this is what we continue to qualify as **being positive progress."** Defendant Sandrock echoed this enthusiasm, stating:

> I would just say that we had always planned to have a pre-BLA meeting with FDA. That hasn't changed. That was always in the planning. And, look, some members of the team they get COVID. And I can tell you it's hard to work when you have COVID. The fatigue, mental and physical fatigue was such that there were some people who were affected by the disease.
>
> *            *            *
>
> So I think that that's part of it, but I would say that most of it is that I would say the **main point is that nothing has come up with the data that has changed our interpretation. And we believe EMERGE is a positive study, it was positive on the pre-specified primary and all three secondary endpoints. You know, I mean, we have done an analyses on ENGAGE to try to figure out why that result was different, but we believe that the fundamentals are the same and that the potential for approval remains the same as Michel said from the very beginning.**

62.    On July 22, 2020, Biogen filed its quarterly report on SEC Form 10-Q for the period ended June 30, 2020 (the "2Q 2020 Report") which was signed by Defendant Capello. Attached to the 2Q 2020 Report were certifications pursuant to SOX signed by Defendants Vounatsos and

Capello attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

63.    The 2Q 2020 Report stated the following, in pertinent part, regarding aducanumab:

In July 2020 we and our collaboration partner Eisai Co., Ltd. (Eisai) announced that we completed the submission of a Biologics License Application (BLA) to the U.S. Food and Drug Administration (FDA) for the approval of aducanumab, an anti-amyloid beta antibody candidate for the potential treatment of AD. T*he completed submission followed ongoing collaboration with the FDA and includes clinical data from the Phase 3 EMERGE and ENGAGE studies as well as the Phase 1b PRIME study.*

During the first quarter of 2020 we initiated the EMBARK global re-dosing clinical study, which is designed to evaluate aducanumab in eligible AD patients who were actively enrolled in aducanumab

64.    During the Earnings call held on the same day, Defendants Vounatsos and Sandrock focused their presentation on Biogen's regulatory submission, while they continued to feed the market with their own overly positive conclusions about the implications of the results of Biogen's phase 3 (Studies 302 and 301) and phase 1 trials (Study 103).   In pertinent part, Defendant Vounatsos stated:

This submission brought ongoing collaboration with the FDA and *include data from a comprehensive clinical development program, including EMERGE, the first positive Phase III study ever in this space. Together, with supporting data from the Phase III ENGAGE study and positive results from the Phase Ib PRIME study*.

65.    Defendant Sandrock also touted the Biogen's regulatory submission, which purportedly  was based upon positive and supporting results of Biogen's phase 3 and phase 1 trials, stating in pertinent part:

This submission is based upon EMERGE, the first positive Phase III study for a therapy to reduce clinical decline in Alzheimer's disease, *supporting data from ENGAGE*, although this study did not meet its primary endpoint, and positive results from the Phase Ib PRIME study. We participated in a pre-BLA meeting with the FDA, during which the agency reiterated that submitting the BLA based on data from EMERGE, ENGAGE and PRIME was reasonable.

\*        \*        \*

[L]ook, the filing is based on these three studies; EMERGE, ENGAGE and PRIME. EMERGE is the first study to show an effect not only on the primary endpoint, but all three pre-specified secondary endpoint. ***We believe that data from ENGAGE, that portions of the data from ENGAGE, a negative study, the portions of it do support the analysis that we did with EMERGE. And then I'll spend also PRIME which was published shows a -- even though the clinical endpoints were exploratory endpoints, on the highest dose there was an effect on MMSE as well as CDR Sum of Boxes. And, again, very similar to that, the lower doses did not show much of an effect. So consistent with the findings from ENGAGE and EMERGE, you really need to get to the higher dose and I think our data are all consistent with that.***

66.    On October 21, 2020, Biogen filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2020 (the "3Q20 Report") which was signed by Defendant McDonnell. Attached to the 3Q20 Report were certifications pursuant to SOX signed by Defendants Vounatsos and McDonnell attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

67.    The 3Q20 Report stated the following, in pertinent part, regarding aducanumab:

In July 2020 we completed the submission of a Biologics License Application (BLA) to the U.S. Food and Drug Administration (FDA) for the approval of aducanumab, an anti-amyloid beta antibody candidate for the potential treatment of Alzheimer's disease that we are developing in collaboration with Eisai Co., Ltd. (Eisai). ***The completed submission followed ongoing collaboration with the FDA and includes clinical data from the Phase 3 EMERGE and ENGAGE studies as well as the Phase 1b PRIME study.*** In August 2020 the FDA accepted the BLA and granted Priority Review with a Prescription Drug User Fee Act action date on March 7, 2021. During the first quarter of 2020, we initiated the EMBARK global re-dosing clinical study, which is ***designed to evaluate aducanumab in eligible Alzheimer's disease patients who were actively enrolled in aducanumab studies (PRIME, EVOLVE, EMERGE and ENGAGE) in March 2019***.

68.    On November 4, 2020, FDA posted on its website briefing documents for the FDA's Peripheral and Central Nervous System (PCNS) Drugs Advisory Committee meeting scheduled for November 6, 2020.    Among them was a 139-page presentation ("Biogen

Presentation") prepared jointly by Biogen and the FDA.  The Biogen Presentation sought to discount the discordance between the negative results of Study 301 and the positive results of Study 302.  Furthermore, the Biogen Presentation attempted to portray the post hoc analyses of Study 302  as providing evidence of aducanumab's effectiveness in treating Alzheimer's disease, stating in pertinent part that "Study 302 is a positive study, providing the primary contribution to the substantial evidence of the effectiveness of aducanumab."   As to the failed Study 301, the Biogen Presentation concluded that based on its post hoc analyses, the "overarching hypothesis was that if aducanumab were an effective treatment for Alzheimer's disease, then there should be patients in Study 302, the positive study, that drive the overall effect. Additionally, in such a situation, a set of patients in Study 301, the failed study, with those same characteristics should show a response similar to that seen in Study 302."

69.    This news had massively positive impact on the price of Biogen's common shares, which skyrocketed 47% during intraday trading on November 4, 2020.

70.    The above statements identified in ¶¶ 33 - 68 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and failed to disclose to investors that: (1) Study 302, viewed independently, did not provide strong evidence that supported the effectiveness of aducanumab; (2) Study 103 did not provide supportive evidence of the effectiveness of aducanumab; (3) Study 302 could not be considered as primary evidence of effectiveness of aducanumab for the treatment of Alzheimer's disease in light of the results of the exploratory analyses of Study 301 and 302 and the results of Study 103; (4) the totality of the data did not provide sufficient evidence to support efficacy of aducanumab for the treatment of Alzheimer's disease; and (5) as a result, Defendants' statements about its business, operations, and

prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### The Truth Is Revealed

71.    On November 6, 2020, after a seven-hour virtual meeting, the FDA Advisory Panel sharply rejected Biogen's arguments in support of the approval of aducanumab.  In a nearly unanimous vote, the panel concluded that it was not "reasonable" to consider the research presented as "primary evidence of effectiveness of aducanumab for the treatment of Alzheimer's disease."  In an overwhelmingly negative committee meeting, the panel rebuffed the positive briefing documents submitted by Biogen and the FDA.  Some of the panelists' commentary included statements that the briefing documents are "strikingly incongruent" from a "compelling statistical review" and that it was difficult to understand how the FDA believe the total data package was positive.  Additional concerns included a potential bias caused by certain missing data after the trial was stopped, unblinding bias from certain abnormalities, lack of correlation of biomarkers with clinical efficacy, and study design differences.

72.    Biogen issued a press release that same day titled "UPDATE ON FDA ADVISORY COMMITTEE'S MEETING ON ADUCANUMAB IN ALZHEIMER'S DISEASE" which stated the following about the FDA vote:

> Today, the U.S. Food and Drug Administration (FDA) Peripheral and Central Nervous System Drugs Advisory Committee voted 1 yes, 8 no and 2 uncertain on the question, "Does Study 302 (EMERGE), viewed independently and without regard for Study 301 (ENGAGE), provide strong evidence that supports the effectiveness of aducanumab for the treatment of Alzheimer's disease?". The Advisory Committee also voted 0 yes, 7 no and 4 uncertain on the question, "Does Study 103 (PRIME) provide supportive evidence of the effectiveness of aducanumab for the treatment of Alzheimer's disease?", and 5 yes, 0 no and 6 uncertain on the question, "Has the Applicant presented strong evidence of a pharmacodynamic effect of aducanumab on Alzheimer's disease pathophysiology?". Finally, the Advisory Committee voted 0 yes, 10 no and 1 uncertain on the question, "In light of the understanding provided by the exploratory analyses of Study 301 and Study 302, along with the results of Study

103 and evidence of a pharmacodynamic effect on Alzheimer's disease pathophysiology, it is reasonable to consider Study 302 as primary evidence of effectiveness of aducanumab for the treatment of Alzheimer's disease?"

73.    In light of the FDA advisory panel's consideration of Biogen's regulatory submission, Biogen trading was halted the morning of November 6, 2020.  When trading resumed, on November 9, 2020, Biogen's stock price fell $92.64 per share, or 28%, to close at 236.26 per share, wiping more than $14 billion in investor wealth.

74.    As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## CLASS ACTION ALLEGATIONS

75.    Plaintiff brings this action pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on its own behalf and as representative a Class, consisting of all those who purchased or otherwise acquired Biogen shares during the Class Period ("Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

76.    The Class is so numerous and geographically dispersed that joinder of all members is impracticable.  Throughout the Class Period, Biogen shares were actively traded on the Nasdaq. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be readily identifiable from information and records in the possession of Defendants or its transfer

agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

77.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and members of the Class sustained damages from the same wrongful conduct of Defendants. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws described herein.

78.     Plaintiff will fairly and adequately protect and represent the interests of members of the Class. Plaintiff is an adequate representative of the Class and has no interest which is adverse to the interests of absent Class members.  Plaintiff has retained counsel competent and experienced in class action litigation, including class actions in the financial services industry.

79.     Common questions of law and fact exist as to all members of the Class, which predominate over questions affecting solely individual members of the Class. These common questions of law include, without limitation:

- whether statements made by Biogen and the Individual Defendants to investors during the Class Period included misrepresentations of material facts about Biogen's prospects of securing regulatory approval for aducanumab and the strength of the clinical data relating to aducanumab;

- whether Biogen and the Individual Defendants acted knowingly or recklessly in issuing false and misleading statements or omitting material information that would correct the misstatements;

- whether Biogen's and the Individual Defendants' acts as alleged herein constituted violations of the federal securities laws;

- whether the prices of Biogen shares during the Class Period were artificially inflated due to Biogen's and the Individual Defendants' conduct described herein;

- injury suffered by Plaintiff and Class members; and

- the appropriate measure of damages suffered by Plaintiff and Class members.

80.    A class action is superior to other methods for the fair and efficient adjudication of the controversy because joinder of all Class members is impracticable. Treatment as a class will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.

81.    Class treatment will also permit the adjudication of claims by many Class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Biogen and the Individual Defendants.

82.    Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## APPLICABILITY OF PRESUMPTION OF RELIANCE FRAUD ON THE MARKET DOCTRINE

83.    The market for Biogen shares was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Biogen's shares traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired the Company's shares relying upon the integrity of the market price of Biogen shares and market information provided by and relating to Biogen, and have been damaged thereby.

84.    During the Class Period, the artificial inflation of Biogen's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the

Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Biogen's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Biogen's financials and its business, operations, and prospects, thus causing the price of the Company's shares to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Biogen shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing Biogen shares at such artificially inflated prices, and each of them has been damaged as a result.

85.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine as:

- Biogen and the Individual Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- these misrepresentations and omissions were material to Plaintiff and the Class;

- Biogen shares were traded on the Nasdaq and were covered by numerous analysts;

- Biogen shares were liquid and traded with significant volume during the Class Period;

- the misrepresentations and omissions alleged herein would likely induce a reasonable investor to misjudge the value of the Biogen shares; and

- Plaintiff and Class members purchased and/or sold Biogen shares between the time Biogen and the Individual Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

86.    As a result of the foregoing, the market for Biogen shares promptly digested current information regarding Biogen from all publicly available sources and reflected such information in Biogen's share price. Under these circumstances, all purchasers of Biogen's shares during the

Class Period suffered similar injury through their purchase of Biogen's shares at artificially inflated prices. Thus, a presumption of reliance applies.

87.     Accordingly, Plaintiff and Class members are entitled to a presumption of reliance upon the integrity of the market.

88.     In the alternative, Plaintiff and Class members are entitled to a presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 1456 (1972), because Defendants omitted material information during the Class Period violating a duty to disclose such information as described above.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## **LOSS CAUSATION**

89.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class. Plaintiff and the Class would not have purchased shares of Biogen stock if the Company had not made the misrepresentations alleged above or had not failed to provide the investing public the material adverse information alleged herein.

90.     During the Class Period, Plaintiffs and the Class purchased Biogen's shares at artificially inflated prices and were damaged thereby. The price of Biogen shares significantly declined when the misrepresentations made to the market, and/or the information alleged herein

to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

91.    As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Defendants, by virtue of their receipt of information reflecting the true facts regarding Biogen, their control over, and/or receipt and/or modification of Biogen's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Biogen, participated in the fraudulent scheme alleged herein.

92.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including Individual Defendants. By way of example, Defendants acted intentionally and recklessly when they touted Biogen's engagement with the regulators as well as the strength of the clinical data and the results of clinical trials that underly the regulators' approval of aducanumab. Defendants knew that serious concerns and questions existed as to the interpretation of the data and the validity and strength of the conclusions Biogen drew out of the clinical trials conducted to assess the efficacy of aducanumab.  Similarly, Defendants acted intentionally and recklessly in touting the intensive collaboration between Biogen and the FDA as well as FDA's

interest in seeing aducanumab approved in the United States. These misstatements had the purpose and effect of artificially inflating the price of Biogen's securities. Defendants knew these statements were false or acted with reckless disregard as to their truth or falsity.

93.    The Individual Defendants, because of their positions with Biogen, made and/or controlled the contents of the Company's public statements during the Class Period. Each Defendant was provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations that were being made were materially false and misleading. As a result, each of these Defendants is responsible for the accuracy of Biogen's corporate statements and are therefore responsible and liable for the representations contained therein.

94.    Additionally, according to public sources, on November 4, 2020 — when Biogen's price reached its 52-week high — Defendant Sandrock, the Company's Chief Medical Officer, divested 1,500 shares of Biogen for a total proceeds of more than *$500,000*, which represented about 10% of his entire personal holdings of Biogen.

## NO SAFE HARBOR

95.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the allegedly false statements and omissions pled in this Complaint. The statements alleged to be false and misleading herein relate to then-existing facts and circumstances. To the extent certain of the statements alleged to be false and misleading may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made, and were not accompanied by meaningful cautionary statements

identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pled herein, Biogen and the Individual Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Biogen who knew that those statements were false and misleading when made.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**(Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder)**
**Against All Defendants**

96.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

97.    During the Class Period, Biogen and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved false statements which they knew to be false or deliberately disregarded whether they were in fact true or false in that they contained misrepresentations and failed to disclose material facts to make the statements made not misleading.

98.    Biogen and the Individual Defendants violated § 10(b) of the 1934 Act and Rule 10b-5 by: (a) making false statements of material facts or omitted to state material facts needed to make the statements not misleading; or (b) engaging in acts and practices that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with purchases of Biogen shares during the Class Period.

99.     Biogen and the Individual Defendants acted with scienter because they knew that the statements issued in the name of Biogen were materially false and misleading; knew that these statements would be disseminated to investors; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of these statements as primary violations of securities laws. Biogen and the Individual Defendants, through receipt of information reflecting true facts about Biogen, their control over, and/or receipt of or modification to Biogen's allegedly materially misleading statements, which made them aware of Biogen's confidential proprietary information, participated in the fraudulent scheme complained of herein.

100.    The Individual Defendants had actual knowledge of material omissions and/or the falseness of material statements set forth by Biogen, and intended to deceive Plaintiff and Class members, or at a minimum, recklessly disregarded the truth through their failure to ascertain and disclose the truth in statements made by them or other Biogen employees to investors, including Plaintiff and Class members. These misrepresentations and omissions were material. A reasonable investor would consider the facts important in deciding whether to buy shares of Biogen stock and would have viewed the aggregate of information available to be significantly altered by the disclosure of this and other material omitted facts.

101.    Pursuant to the foregoing, the price of Biogen shares was artificially inflated during the Class Period. Due to their lack of knowledge of the false nature of statements made by Biogen and the Individual Defendants, Plaintiff and Class members relied on the statements made by Biogen and the Individual Defendants and/or the integrity of the market price of Biogen shares during the Class Period in purchasing Biogen shares at prices that were artificially inflated due to false and misleading statements made by Biogen and the Individual Defendants.

102.    Were Plaintiff and Class members made aware that the market price of Biogen shares were artificially and falsely inflated by misleading statements made by Biogen and the Individual Defendants, and by material adverse information that Biogen and the Individual Defendants failed to disclose, they would not have purchased Biogen shares at artificially inflated prices, or purchased them at any price.

103.    Based on the wrongful conducted alleged herein, Plaintiff and Class members have suffered damages in an amount to be determined at trial.

104.    Biogen and the Individual Defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiff and Class members for significant damages suffered via their purchases of Biogen shares during the Class Period.

## SECOND CLAIM FOR RELIEF

### (Violation of Section 20(a) of the Exchange Act)
### Against the Individual Defendants

105.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

106.    During the Class Period, the Individual Defendants were involved in the management and operation of Biogen's business affairs. Due to their senior positions, they had knowledge of adverse non-public information regarding Biogen's lack of data security and vulnerabilities of the platform and the lack of adequate training for students, teachers, and parents.

107.    As directors and/or officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information regarding Biogen's financial condition and results of operations, and to correct any public statements issued by Biogen which were materially false or misleading.

108.    Due to their positions of authority at Biogen, the Individual Defendants controlled the contents of various public filings, press releases and reports which Biogen disseminated in the market during the Class Period.  During the Class Period, the Individual Defendants utilized their authority to cause Biogen to execute the wrongful acts alleged herein. the Individual Defendants were therefore "controlling persons" at Biogen pursuant to Section 20(a) of the Exchange Act. On this basis, they were participants in the unlawful conduct alleged which caused the prices of Biogen shares to be artificially inflated.

109.    Based on the conduct described above, the Individual Defendants are liable for the violations committed by Biogen pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully demands relief as follows:

A.    Certifying this lawsuit as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiff as Class Representative;

B.    Awarding damages in favor of Plaintiff and members of the Class against Biogen and the Individual Defendants, jointly and severally, for all damages sustained as a result of Biogen's wrongdoing, in an amount to be proven at trial;

C.    Awarding Plaintiff and members of the Class their costs of suit, including reasonable attorneys' fees and expenses, and including expert fees, as provided by law;

D.    Awarding Plaintiff and members of the Class pre- and post-judgment interest at the maximum rate allowable by law; and

E.    Directing such further relief as it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated: January 5, 2020                    Respectfully submitted,

**HUTCHINGS, BARSAMIAN, MANDELCORN, LLP**

*/s/ Theodore M. Hess-Mahan*
Theodore M. Hess-Mahan
110 Cedar Street, Suite 250
Wellesley Hills, Massachusetts 02481
Telephone: 781-431-2231
Email: thess-mahan@hutchingsbarsamian.com

*Counsel for Plaintiff*

**LOWEY DANNENBERG, P.C.**

*/s/ Uriel Rabinovitz*
Uriel Rabinovitz (*pro hac vice* forthcoming)
Christian Levis (*pro hac vice* forthcoming)
Andrea Farah (*pro hac vice* forthcoming)
44 South Broadway, Suite 1100
White Plains, New York 10601
Telephone: 914-997-0500
Facsimile: 914-997-0035
Email: urabinovitz@lowey.com
        clevis@lowey.com
        afarah@lowey.com

*Counsel for Plaintiff*